IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **RUBY L. LADD,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil No. 04-631-CJP** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM and ORDER**

In accordance with **42 U.S.C. § 405(g)**, plaintiff Ruby L. Ladd seeks judicial review of the final agency decision finding that she is not disabled and denying her Disability Insurance Benefits (DIB) and a period of disability pursuant to **42 U.S.C. § 423**.

**Procedural History**

Plaintiff filed an application for DIB on July 19, 2001. She initially alleged that her disability began on May 31, 2001. (Tr. 49-51). She later amended the onset date to October 18, 2001, the date on which she stopped working. (Tr. 202). She claimed disability due to high blood pressure, headaches, stress attacks, asthma, and depression (Tr. 23-24, 62, 68).

The application was denied initially and on reconsideration, and at plaintiff's request, a hearing was held before Administrative Law Judge (ALJ) Joseph E. Brezina on October 10, 2002. (Tr. 109-252). ALJ Brezina denied the application for benefits in a decision dated November 14, 2002. (Tr. 14-20). Plaintiff's request for review was denied by the Appeals Council, and the November 14, 2002, decision became the final agency decision. (Tr. 4-6).

Plaintiff has exhausted her administrative remedies and has filed a timely Complaint in this Court.

**Issues Raised by Plaintiff**

Plaintiff argues that the ALJ's decision denying her benefits was not supported by substantial evidence in the following respects:

1. The ALJ did not properly evaluate plaintiff's complaints of pain in that he did not consider her medications and the side effects thereof.

2. The ALJ's credibility determination was flawed in that he improperly speculated that the fact that plaintiff cared for her young grandchild was inconsistent with her testimony that she could only lift less than ten pounds. Also, the ALJ ignored her treating doctor's opinion that she suffered from moderately severe daily pain.

### The Evidentiary Record

The Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record.

**1.    Record of Earnings**

Plaintiff did not have any earnings in the years 1977 through 1995. She had earnings from 1996 to 2001. She had no earnings in 2002. (Tr. 52).

**2.    Plaintiff's Testimony**

Plaintiff was represented at the hearing by attorney Pat Prendergast. (Tr. 198).

Ruby L. Ladd was born in 1949 and was 53 years old at the time of the hearing on October 10, 2002. (Tr. 198).

Plaintiff's application for social security benefits stated she became disabled as of May, 2001. However, she testified that she actually worked until October 18, 2001. (Tr. 200-202).

Plaintiff has a GED and attended Rend Lake College for two years. (Tr. 204). Later, she testified that she had more than 2 years of college, but was not sure how many years she had. She does not have a college degree. (Tr. 240-243). Her last employment was as a study hall

supervisor and detention supervisor at Mount Vernon High School. She sat for half the time and stood for half the time at that job. (Tr. 205). She left that job because she could not handle the stress of disciplining the students. (Tr. 206).

She testified that she cannot do her old job at the high school "because of the stress." (Tr. 230).

On the day before the hearing, her treating doctor, Dr. Garretson, changed her depression medication from Zoloft to Zypreza, and also put her on Celexa. (Tr. 2-7-208).

Her medications make her sleepy and drowsy. She testified that she takes her medication in the morning and sleeps for 3 or 4 hours after that. (Tr. 208-209). She has panic attacks during which she feels like bugs are crawling on her, she gets a headache, and starts shaking. She gets these attacks when she gets "bad news" or gets too stressed or she has to "yell too loud or something." (Tr. 210-211). The testimony was unclear as to how often she has these attacks, although there was a reference to attacks occurring daily. She testified that the attacks had not lessened in frequency even though she is no longer working and rarely leaves her home. (Tr. 211-212).

Plaintiff testified that she has pain in her shoulders, which is eased by medication. (Tr. 215). She testified that her doctor told her she is "going to have to have surgery." (Tr. 214). She cannot raise her arms above shoulder level. (Tr. 215). She rated her shoulder pain at 7 on a scale of 1 to 10. (Tr. 217).

Ms. Ladd testified that she has arthritis in both knees, but that the left is worse. (Tr. 217-218). Her knees hurt "most of the time." (Tr. 218).

Plaintiff testified that she has breathing problems for which she uses Proventil spray every 6 hours and a nebulizer for "emergencies." (Tr. 219). She also testified that she has headaches every other day which are so severe that she must take medication and lay down for

an hour or two. (Tr. 221).

She testified that she can stand for only 20 to 25 minutes before she must sit down due to low back pain. (Tr. 222-223). She testified that she can sit for only about a half hour. (Tr. 225-226). She can lift less than 10 pounds. (Tr. 227). She can walk only about 2 blocks. (Tr. 228).

She testified that she cannot do her old job at the high school "because of the stress." (Tr. 230).

Her daughters do most of her housework, her laundry, and take her shopping. (Tr. 231-232). Ms. Ladd testified that her daily activities are very limited. She goes to church Sunday, Wednesday, and Friday. Other than that, she watches tv, reads, and sleeps. (Tr. 234-236).

One of Ms. Ladd's daughters had a baby that she could not take care of, so she "gave her" to Ms. Ladd about two years prior to the hearing. The child was three years old at the time of the hearing. Plaintiff testified that she herself could no longer take care of the child, so her other daughter, who lives next door, helps care for her. (Tr. 237).

Ms. Ladd testified that the granddaughter lives with her, and that her daughter Shareen lives there "sometime." Then, she testified that "It's just me mostly. The grandbaby is with the other kids." (Tr. 239).

### 3.     Testimony of Vocational Expert

Thomas Upton, Assistant Professor at Southern Illinois University, testified as a vocational expert. (Tr. 37).

Upton testified that plaintiff's previous work was at the light exertional level, and was unskilled. (Tr. 244).

The ALJ asked Upton to assume a person of Ms. Ladd's age, education, and work experience, who would require low stress (non-production oriented) work, with simple, one, two or three step instructions, not functioning as a member of a team, with the ability to lift 10

pounds frequently and up to 20 pounds occasionally; sit/stand option, push/pull within weight restrictions, avoid overhead reaching, in a relatively clean work environment, with occasional stooping and crouching. (Tr. 245-246). He testified that such a person could not perform the plaintiff's past work. He testified that such a person could perform the following work at the light, unskilled level: commercial laundry (2,800 jobs), and hand packer (13,000 jobs). She could also perform the work of surveillance monitor (260 jobs) which is sedentary and unskilled. (Tr. 245-247).

Upton also opined that, if he were to assume that Ms. Ladd's testimony were completely credible, she would not be able to perform her past work or to work even at any exertional level. (Tr. 243-244).

Plaintiff's counsel then asked Upton to assume an individual with the restrictions outlined in Dr. Garretson's functional capacity assessment. Upton testified that person could not perform the work of commercial laundry or hand packing but that she could still do the surveillance monitor job. (Tr. 248-249). However, he also testified that if "moderately severe pain" meant pain in the range of 6 to 8, that would interfere with her ability to work and would preclude employment. (Tr. 249-250).

**4.      Medical Records - Dr. Garretson**

Plaintiff's main treating doctor is Dr. Richard H. Garretson. The earliest record from Dr. Garretson is a note documenting a phone call from Ms. Ladd on August 24, 2000, seeking a prescription for Celebrex. (Tr. 162).

Ms. Ladd was seen by this doctor at Crossroads Community Hospital, where she was admitted from September 19, 2000, to September 22, 2000, for chest pain. Tests showed no cardiopulmonary disease. The diagnosis was "hypertension, essential, benign without kidney or heart disease." (Tr. 126).

The earliest office visit is October 6, 2000; that visit was follow-up for the hospital stay for complaints of chest pain. The note says "needs to be released to go to work." (Tr. 161). She had a stress echo in the hospital which was "perfectly normal with no evidence of heart disease." The doctor wrote "She must have a lot of anxiety problems." She was taking Ambien to sleep and Lorazepam. She complained of tiredness and fatigue. The doctor told her she would have to reduce her dose of Lorazepam if she wanted to feel less tired, but he "doubt[ed] seriously that she will follow through." He noted that she had "hypertension, essential, benign." (Tr. 161).

Ms. Ladd saw the doctor 3 times from October 6, 2000, to May 9, 2001. One visit was for bronchitis. (Tr. 158). On May 9, 2001, she reported that her grandson, who was supposed to report for prison, had left town; and she was upset and needed increased "nerve medicine." (Tr. 155). The records contain notes of regular phone calls from plaintiff seeking refills of medications such as Tylenol #3, Ambien, and her inhaler. (Tr. 151-162).

She called the office on September 28, 2001, and stated that she was going to apply for social security because of the stress she was under at work. (Tr. 151). Dr. Garretson saw her on October 5, 2001, and described her as "extremely tense, nervous, and anxious. (Tr. 150). Dr. Garretson documented that he told her that "if she wants to get some Social Security Disability, she's going absolutely have to have [sic] a psychological evaluation." (Tr. 150).

The next visit was on January 29, 2002, when she presented for a check of her blood pressure, and also her knees, back and shoulders "for arthritis." (Tr. 149). The records note she was "trying to get disability." The doctor stated that she has a "multitude of problems," including arthritis of the shoulders and back, severe hypertension, and that she is "an extremely anxious person, easily depressed." X-rays of the shoulders showed "severe arthritic deformities of the acromioclavicular joint, with hypertrophy that would obviously cause impingement." (Tr. 149). She could not abduct her arms past 90 degrees. Lumbar spine X-rays showed arthritic

changes compatible with her age, and a "very large osteophyte anteriorly." He recommended an MRI of her shoulders.

The MRI was done on February 7, 2002. The radiologist reported that the right shoulder showed moderate degenerate change in the acromioclavicular joint, and findings consistent with partial tear of the supraspinatus tendon versus moderate tendinosis. The left shoulder had findings most likely due to mild tendinosis, and moderate degenerate change in the acromioclavicular joint. (Tr. 163-164).

Ms. Ladd saw Dr. Garretson to get the results of the MRI on February 11, 2002, Dr. Garretson noted she had bilateral impingement of her shoulders, "confirmed on MRI." He referred her to Dr. Ahn. (Tr. 181).

Dr. Garretson saw her 2 more times. On March 13, 2002, she reported that her speech had been slurred and she had "gone in to see if she had a stroke." He stated that she was "seen today lagging [sic] for some different nerve pills." He switched her from Xanax to Lorazepam. (Tr. 180). On June 26, 2002, she was seen "in follow-up." Dr. Garretson stated she was "using a predacious amount of narcotics, says it's all for joint aches and pains." (Tr. 172).

On June 17, 2002, Dr. Garretson completed a functional capacity assessment form. (Tr. 144-147). He stated that Ms. Ladd could stand for 8 hours, walk for 6 hours, sit for 8 hours, sit/stand for 8 hours, in an 8 hour work day. She could occasionally climb stairs/ladder and stoop, but never reach above shoulder level. She could frequently lift up to 10 pounds and occasionally lift to 20 pounds. She could never do repetitive actions involving pushing/pulling with the shoulder, but could do such actions involving simple grasping and fine manipulating. She complained of "moderately severe" pain in her shoulders and back. The pain was said to be "daily" and was precipitated by "movement of shoulders." She was taking Tylenol 3 for pain.

**5.     Medical Records - Dr. Joon Ahn**

Dr. Ahn saw Ms. Ladd on February 18, 2002.  He noted that active abduction of the shoulders was "full, with significant pain."  She had tenderness in both shoulders, and Hawkin's test and impingement sign were positive.  He recommended that she take Vioxx and physical therapy.  He indicated he would see her again in 6 weeks, but there is no record of another visit.  (Tr. 167-168).  There are no records of physical therapy.

**6.     Consultative Examination - Harry J. Deppe, Ph.D.**

Dr. Deppe performed a psychological examination at the request of the Bureau of Disability Determinations Services on October 20, 2001.  (Tr. 140-143).  He diagnosed panic attacks with agoraphobia.  He concluded that she had mildly impaired ability to relate to others and mildly impaired ability to withstand the stress and pressures of day-to day work activity.  He also concluded that her ability to understand and follow simple instructions and ability to maintain attention required to perform simple, repetitive tasks were intact.

**7.     State agency physician reports**

On March 5, 2002, Dr. Gotway concluded that Ms. Ladd was capable of medium work with restrictions.  He noted that she had limitation of her ability to abduct her shoulders, and that she was treated for headaches, stress, anxiety, hypertension, as well as asthma.  However, he found that she could occasionally lift up to 50 pounds and frequently lift up to 25 pounds, and that she could stand for 6 out of 8 hours and sit for 6 out of 8 hours.  He noted that she could not reach over her head, but found that she had no limitation of her ability to perform gross or fine manipulation.  (Tr. 96- 103).

On December 13, 2001, M.A. Wharton concluded she had panic disorder with agoraphobia, and depression, but that her cognitive and attentional skills were intact and adequate for simple one-two step work tasks.  Her symptoms of anxiety moderately limited her ability to manage detailed tasks.  Her interpersonal skills were moderately limited, but her

adaptive skills were within normal limits. (Tr. 106.)  Donald E. Henson concurred in this opinion on February 9, 2002.

## Applicable Standards

To qualify for disability insurance benefits, a claimant must be "disabled."  "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).**  A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See,** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992);** *Pope v. Shalala*, **998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and she is not capable of performing her past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that claimant is capable of performing. **See,** *Bowen v. Yuckert*, **482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** *Knight v. Chater*, **55 F.3d 309, 313 (7th Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** Thus, the Court must determine not whether Plaintiff is, in fact, disabled, but whether ALJ Pritchett's findings were supported by substantial evidence; and, of course, whether any errors of law were made. **See,** *Books v. Chater*, **91 F.3d 972, 977-978 (7th Cir. 1996) (citing** *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir.1995)).** The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997).** In analyzing the ALJ's decision for "fatal gaps or contradictions," the Court "give[s] the opinion a commonsensical reading rather than nitpicking at it. *Johnson v. Apfel*, **189 F.3d 561, 564 (7th Cir. 1999)**.

### Analysis

The ALJ properly followed the five-step inquiry. He found that plaintiff has severe impairments, but that her impairments do not meet or exceed a listed impairment. Plaintiff does not challenge this finding. He also found that plaintiff is unable to perform her past relevant work. He concluded that plaintiff's testimony regarding her level of pain and her physical limitations was not credible because it was inconsistent with her daily activities and with the medical evidence. He then found that she has the residual functional capacity to perform a limited range of light work activity.

Plaintiff raised two points which are interrelated. Her first point is that the ALJ erred in

evaluating her pain because he did not consider the side effects of her medication.  Her second point is that the ALJ speculated as to her ability to care for her grandchild, and drew unsupported conclusions based on his speculation.

Dr. Garretson has been prescribing medication for pain and stress and to help plaintiff sleep on a regular basis since October, 2000.  These prescriptions have included Tylenol #3, Lorazepam, Ambien, Xanax, Vicodin, and Darvocet.  The ALJ noted her testimony that "she lies down and sleeps during the day because her medications make her drowsy, and she no longer drives a car for this reason."  (Tr. 16).

The vocational expert testified that, if Ms. Ladd's testimony about her limitations, including the need to lay down for one to two hours and sleep due to her medications,  were credible, she would not be capable of performing work at any exertional level on a sustained basis.  (Tr. 244-245).

The ALJ evidently did not believe Ms. Ladd's testimony about needing to lay down and sleep for hours during the day.  Medication side effects are to be considered by the ALJ in evaluating a claimant's complaints, along with other factors.  **20 C.F.R. § 404.1529(c) (3)-(4)**.  However, the ALJ is not required to make specific findings about the side effects of medication.  ***Nelson v. Secretary of Health & Human Services,* 770 F.2d 682, 685 (7th Cir. 1985).**

The ALJ found plaintiff's subjective complaints in general to be inconsistent with her daily activities and with the medical evidence.  He discussed several discrepancies between her subjective complaints and the medical records.  He noted that her treating physician, Dr. Garretson, indicated in June, 2002, that she had no limitation in standing or sitting, and that she could walk 6 hours out of an 8 hour day.  He also noted that, in October, 2001, a consultative psychological exam indicated that she had no significant limitations with her work-related activities.  Ms. Ladd testified that she stopped working in October, 2001, because of a "nervous

-11-

breakdown," but the ALJ pointed out that "there is absolutely nothing in the record to indicate that she was experiencing any severe emotional problems at that time..." (Tr. 17).

The ALJ also discussed the fact that, according to the report of a mental health assessment intake interview at Jefferson County Comprehensive Services, Inc., on March 28, 2002, plaintiff was able to care for herself and her grandchild. The report stated that Ms. Ladd told the interviewer that she lived alone, and was able to care for her own basic needs and to care appropriately for her granddaughter. (Tr. 191). The report also stated that Ms. Ladd "feels significant anxiety" when she leaves her home, and that escalating panic attacks and fear of crowds had affected her ability to work and caused her to leave her job at the high school. (Tr. 190).

The ALJ stated that "It is highly unlikely that an individual with the level of pain and the degree of functional limitations the claimant has described would be able to provide full-time care for an infant, and although the claimant testified that she is no longer caring for this child, the evidence alone reveals that she was capable of performing the physical requirements needed for the child's full-time care at least through March 28, 2002." (Tr. 18). He calculated that the child would have been about two years old at the time of the amended onset date of October 18, 2001, and opined that it is "virtually impossible to provide full-time care to an infant this young without having to lift them repeatedly throughout the day (and sometimes during the night); however, the claimant testified at the hearing that she can lift less than 10 pounds." (Tr. 18).

Ms. Ladd's testimony was somewhat confusing with regard to her granddaughter. Ms. Ladd testified that the child was three and that her daughter "gave her to me about two years ago, I think" (Tr. 237). She also stated "I can't take care of her anymore" and testified that her daughter who lives next door gets her dressed for school, bathes her, and that the child goes to the daughter's house after school. (Tr. 237). When asked who lives in her house, she first said

the grandbaby lives there, but then reversed herself and said "It's just me mostly.  The grandbaby is with the other kids.  I can't keep her."  (Tr. 239).

It is true that the ability to do household work does not necessarily equate to the ability to work in the labor market.  Secondly, "taking care of an infant, although demanding, has a degree of flexibility that work in the workplace does not."  **Gentle v. Barnhart, 430 F.3d 865 (7th Cir. 2005)**.  However, the ALJ did not improperly equate Ms. Ladd's ability to care for herself and the child in March, 2002, with an ability to work in the labor force at the time of the hearing.  Rather, he found that her ability to care for her infant granddaughter was inconsistent with the level of pain and degree of functional limitation that she claimed, including her claim that she could only lift less than 10 pounds.  (Tr. 18).  His remark that the ability to care for a two year old child is inconsistent with an inability to lift more that 10 pounds is not improper speculation, but is a reasonable inference.

In addition, the ALJ did not, as plaintiff argues, ignore Dr. Garretson's "opinion" that Ms. Ladd suffers from moderately severe daily pain.  First, whether a claimant is disabled is determined by the Commissioner, and not by the claimant's doctor; the ALJ may reject a treating doctor's opinion that is based on the claimant's exaggerated subjective complaints.  **Dixon v. Massanari, 270 F.3d 1171 (7th Cir. 2001).**  Secondly, Dr. Garretson did not express the opinion that Ms. Ladd, in fact, suffered from such pain.  Rather, his report stated that she complained of such pain in her shoulders and back.   Despite her complaints, he found, as the ALJ discussed, that Ms. Ladd was capable of standing and sitting for 8 hours, walking for 6 hours, frequently lifting 10 pounds and occasionally lifting 20 pounds.  (Tr. 145-147).  The ALJ reasonably concluded that her complaints of disabling pain were not credible.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness.  **Powers v. Apfel, 207 F.3d 431, 435 (7th Cir.**

**2000).** The credibility findings should not be disturbed unless they are "patently wrong." **See *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)**. The ALJ is not patently wrong here.

While reasonable minds might differ as to whether Ms. Ladd is disabled within the meaning of the relevant standards, the ALJ's decision is supported by substantial evidence in the record. **See, *Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**

## Conclusion

After careful review of the record as a whole, the Court finds that the ALJ committed no errors of law, and that the findings of the ALJ are supported by substantial evidence.

The final decision of the Commissioner of Social Security finding that Ruby L. Ladd is not entitled to a period of disability or Disability Insurance Benefits is **AFFIRMED.**

**The Clerk of Court is directed to enter judgment in favor of defendant.**

**IT IS SO ORDERED.**

**DATE: March 16, 2006.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**